UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | | |
| LIFE CARE ST. JOHNS, INC., | ) | Case No.:   3:13-bk-4158-JAF |
| a Florida not-for-profit corporation, | | |
| doing business as GLENMOOR,[1] | ) | Chapter 11 |
| | | |
| Debtor. | ) | |
| | | |
| _____ | ) | |

CASE MANAGEMENT STATEMENT

In accordance with the Court's Administrative Order of January 28, 2009 Establishing Initial Procedures in Chapter 11 cases, debtor, Life Care St. Johns, Inc. (the "Debtor"), submits this Case Management Statement.

I.      Overview

The Debtor is a not-for-profit organization, exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code (the "IRC"), that owns and operates Glenmoor – a continuing care retirement community ("CCRC").  As a CCRC, Glenmoor is regulated pursuant to Chapter 651, Florida Statues, which establishes a number of operating parameters intended for the benefit or protection of residents. Glenmoor provides "lifecare" to its resident, each of whom reside in a Residential Unit. The "lifecare" concept recognizes that the needs of elderly residents vary along a

_____

[1]    The Federal Employer Identification Number for the Debtor is 59-3474627. The address of the Debtor is 235 Towerview Drive, St. Augustine, Florida, 32092.

continuum from independent living to increasing healthcare needs.   Glenmoor received a certificate of occupancy on November 23, 1999, and opened in October of 2001. Glenmoor is proud to be one of only 15 communities in the state of Florida to be fully accredited by CARF-CCAC, an independent, nonprofit accreditor of health and human services organizations.

The Debtor was formed by Life Care Pastoral Services ("LCPS"), which is the Debtor's sole member.   LCPS also formed Life Care Ponte Vedra ("LCPV") and LCPS Management, Inc. ("LCPS Management").   LCPV owns and operates Vicar's Landing, a CCRC located in Ponte Vedra, Florida.   LCPS Management manages both Glenmoor and Vicar's Landing.   The Internal Revenue Service has determined that each of LCPS, LCPV, and LCPS Management is exempt from federal income taxation pursuant to Section 501(c)(3) of the IRC.

Glenmoor is located in World Golf Village, a master planned community located 25 miles south of downtown Jacksonville and 11 miles north of downtown St. Augustine. World Golf Village is zoned to encompass 2.5 million square feet of office space; 2.5 million square feet of industrial space; 500,000 square feet of retail space; 7,200 residences, comprised of single-family homes, multi-family residences and condominiums; plus 2,775 acres of nature preserves.   At the heart of the World Golf Village is a 200-acre complex, home to The World Golf Hall of Fame.

Glenmoor is home to approximately 247 residents and consists of (i) 159 residential units including 70 apartment homes, 11 one-bedroom cottages, 32 patio homes and 31 estate homes, (ii) an Assisted Living Center with 15 assisted living suites, and (iii) a Health Center containing 30 nursing beds.

II.     **Regulatory Oversight of Continuing Care Facilities**

A.     **Certificate of Authority**

Continuing care facilities in Florida are regulated by the State of Florida Department of Financial Services, Office of Insurance Regulation (the "OIR") under the provisions of Chapter 651, Florida Statutes, as amended ("Chapter 651").

Chapter 651 provides that no person may engage in the business of providing continuing care or enter into continuing care agreements or construct a community for the purpose of providing continuing care without a certificate of authority issued by the OIR. A final certificate of authority may be issued after the applicant has provided the OIR with the information and documents required by Chapter 651.   Once issued, a certificate of authority is valid for so long as the OIR determines that the provider continues to meet the requirements of Chapter 651.

B.     **Required Reserves**

In accordance with the requirements of Chapter 651, the Debtor maintains the following reserves:

- a debt service reserve escrow (the "Debt Service Reserve"), in an amount equal to the principal and interest payments becoming due during the current fiscal year (12 months' interest on the financing if no principal payments are currently due) on any mortgage loan or other long term financing, including lease payments, taxes, and insurance);

- an operating reserve escrow (the "Operating Reserve"), in an amount equal to 15% of the total operating expenses as set forth in the Debtor's annual report filed pursuant to Chapter 651; and

- a renewal and replacement reserve escrow (the "Renewal and Replacement Reserve"), in an amount equal to 15% of the total

accumulated depreciation based on the Debtor's audited financial statement filed pursuant to Chapter 651, not to exceed 15% of the Debtor's average operating expenses for the prior three fiscal years based on the audited financial statements for each of such years.

As of May 31, 2013, the Debtor's Debt Service Reserve was approximately $3,866,000, the Operating Reserve was approximately $1,714,000, and the Renewal and Replacement Reserve was approximately $1,719,000. As required by Florida Statute, the reserves are held in segregated escrow accounts, with the Operating Reserve held in an unencumbered account, for the benefit of Glenmoor's residents.

The Renewal and Replacement Reserve is a restricted reserve that may be used only with OIR approval. Chapter 651 provides that a continuing care provider may, with written permission of the OIR, withdraw each fiscal year up to 33% of the total Renewal and Replacement Reserve available, which is equal to the market value of the invested reserve at the end of the provider's prior fiscal year. Such withdrawal may only be used for capital items or major repairs and must be replaced in the renewal and replacement reserve within 36 months.

Chapter 651 requires the escrow agent holding the reserves to deliver to the OIR quarterly reports on the status of the escrow funds, including balances, deposits and disbursements. Chapter 651 provides that withdrawals of statutorily escrowed amounts can be made from the required debt service and operating reserves only upon at least ten days' prior written notice to the OIR, except that in an emergency the provider may petition for a waiver of such ten-day notice requirement (a waiver being deemed granted if not denied by the OIR within three working days).

### C.      Continuing Care Agreements and Residents' Rights

Chapter 651 prescribes certain requirements for continuing care agreements and requires OIR approval of any changes to the terms of the agreement from the form supplied by the provider in its certificate of authority application.   In addition to requiring that the agreement state the amounts payable by the resident, the services to be provided and the health and financial conditions for acceptance of a resident, Chapter 651 requires that the agreement may be cancelled by either party upon at least 30 days' notice.   A provider which does not give its residents a transferable membership right or ownership interest may retain 2% of the entrance fee per month of occupancy prior to cancellation plus a processing fee not exceeding 4% of the entrance fee, and must pay the refund within 120 days of notice of cancellation.   The Residence and Care Contracts for the Debtor meet the requirements of this provision.

Chapter 651 requires that a prospective resident have the right to cancel without penalty within seven days of signing the continuing care agreement.   During this seven day period, any entrance fee or deposit must be held in escrow or, at the resident's request, held by the continuing care provider and not deposited.   If cancellation occurs after seven days, but prior to occupancy, the entire entrance fee must be refunded less a processing fee not exceeding 4%, within 60 days of notice of cancellation.   However, if cancellation occurs prior to occupancy, due to death, illness, injury or incapacity of the prospective resident, the entire entrance fee must be refunded, less any costs specifically incurred by the provider, at the written request of the resident.

Chapter 651 requires that a resident may not be dismissed or discharged without just cause.   Failure to pay monthly service fees will not be considered just cause until

such time as the entire unearned Entrance Fee, plus any benefits under Medicare or third party insurance is earned by the facility.

Chapter 651 also contains provisions giving residents the right to form residents' organizations and choose representatives; to attend quarterly meetings with the provider; and to inspect the provider's annual reports to the OIR and any examination reports prepared by the OIR or other governmental agencies (except those which are required by law to be kept confidential).   Prior to the implementation of any increase in the monthly maintenance fee, the provider must provide, at a quarterly meeting of the residents, the reasons for any increase in the fee that exceeds the most recently published Consumer Price Index for all Urban Consumers, all items, Class A Areas of the Southern Region (provided that such requirement does not restrict the right of a provider to set monthly maintenance fee increases in excess of such index).   Residents must also be notified of any plans filed with the OIR relating to expansion of the community or any additional financing or refinancing.

III.     **The Debtor's Operations**

      A.     **Residence and Care Contracts**

In accordance with Chapter 651, Florida Statues, residency at Glenmoor is provided pursuant to "Residence and Care Contracts", and requires prospective residents to pay an "Entrance Fee" and a "Monthly Service Fee".   If a prospective resident establishes occupancy at Glenmoor, the Debtor is obligated under each Residence and Care Contract to provide certain services for life to that resident.   A prospective resident has the option to rescind the Residence and Care Contract prior to establishing occupancy at his or her discretion.   If a prospective resident elects to rescind the Residence and Care

Contract within seven days from the date of execution, the Entrance Fee will be refunded to the prospective resident immediately.    If, prior to establishing occupancy, a prospective resident dies or becomes incapable of occupying the Residential Unit because of illness, injury or other physical or mental incapacity, such prospective resident is entitled to receive a full refund of any portion of the Entrance Fee paid, together with interest thereon, within 60 days of termination.    If a prospective resident terminates the Residence and Care Contact for any other reason, the prospective resident is entitled to a full refund, together with interest thereon, less a 4% administrative fee.    Residents may also cancel their Residence and Care Contract at any time after establishing occupancy and receive certain refunds.

The Entrance Fee is a lump sum, one-time payment based on the type of Residential Unit to be occupied by the resident.    A prospective resident must make a 10% deposit prior to or upon the execution of the Residence and Care Contract and pay the remaining 90% of the Entrance Fee on or before the date of occupancy.

The Debtor has historically offered the following Entrance Fee plans contracts:

- Type A non-refundable plan (the "Type A Traditional Amortizing Plan");

- Type A 75 percent refundable contract plan (the "Type A 75 Percent Refund Plan"); and

- Type A 90 percent refundable contract plan (the "Type A 90 Percent Refund Plan").

The Type A contract is a full service package that provides residents with the option of unbundling services and paying a discounted Monthly Service Fee.    In 2011, Glenmoor introduced a Type B (limited healthcare benefit) and Type C contract (no health care benefit), an entrance fee payment plan and various other incentives to

compete with other retirement communities in the market area.   In contrast to Type A Contracts, Type C Contracts were presented unbundled and residents had the option to add service bundles.   Type B Contracts are no longer offered.

In accordance with § 651.055, Florida Statutes, any refund due a resident who terminates a Type A Contract (traditional amortizing entrance fee contract) is to be paid within 120 days' of notice of termination.   For residents with refundable Entrance Fee contracts, the refund is to be paid from the proceeds of the next Entrance Fees received by the Debtor for which there are no prior claims by another individual until paid in full.

As of May 31, 2013, the Debtor owed 29 residents or their estates a total of approximately $7,787,000 in refund obligations.

### B.   Independent Living Units and the Care Facilities

The Glenmoor community includes independent Residential Units, the Assisted Living Facility, and the Health Center.   The community incorporates many "senior friendly" features, including lever hardware, emergency alert systems, special bathing facilities and front control appliances, and was designed to comply with all applicable building codes, the Fair Housing Act, and the Americans with Disabilities Act.

The Residential Units consist of 159 units including 70 apartment homes, 11 one bedroom cottages, 32 patio homes, and 31 estate homes, ranging in size from 875 to 1,935 square feet.   Each Residential Unit is furnished with window treatments; wall-to-wall carpeting, except in the kitchen and bath; a full kitchen with refrigerator/freezer, range with oven, microwave oven and dishwasher; utility room with full size washer/dryer; fire and smoke alarms; fire sprinkler system; individually controlled heating and air conditioning; and a balcony or patio.   Common areas include a

restaurant-style main dining, room; private dining rooms; a lounge; a beauty salon and barber shop; a library; a business center; a creative arts center; a card and game room; an auditorium/multi-purpose room; outdoor recreation areas; a non-denominational chapel; and a fitness center, which includes an outdoor swimming pool, bocce and shuffle board courts, and a putting green.

The Assisted Living Center consists of 15 assisted living suites of 460-square feet each and 15 assisted living rooms of 380 square feet which are in a secured memory-support unit, for residents with memory issues.   The assisted living units have been designed to foster the continued independence of residents who require varying amounts of assistance with activities of daily living. The assisted living suites are private apartments with kitchenettes and full baths, which are furnished with amenities similar to the Residential Units, but do not include the kitchen range, washer and dryer or balcony/patio.   The Assisted Living Center's common areas include a lobby, lounge, arts and crafts area, multipurpose room, dining room and administrative and support areas.

The Health Center contains a total of 30 nursing beds, all in private rooms of approximately 305 square feet.   The Health Care Center includes a Wellness Clinic which provides outpatient services under the direction of a registered nurse.   Physical, occupational, and speech therapies are offered, as are wellness consultations, educational programs and emergency responses.   In addition, home health care services for residents still living independently are offered for various activities of daily living.   The Health Center's common areas include administrative, service and support areas, resident dining, activity, lounge, and therapy areas.

## IV.    Financing

### A.    The 1999 Revenue Bonds

Initial construction of Glenmoor began in early 2000 and was financed through the issuance of (a) $44,355,000 of Series 1999A Fixed Rate Health Care Revenue Bonds; (b) $4,000,000 of Series 1999B Adjustable Rate Health Care Revenue Bonds; and (c) $27,000,000 of Series 1999C Variable Rate Demand Health Care Revenue Bonds (collectively, the "1999 Bonds").   The 1999 Bonds were issued pursuant to Parts II and III of the Act and a Trust Indenture dated as of December 1, 1999 (the "Indenture"), and issued by the St. Johns County Industrial Development Authority (the "Authority"), which is a public agency formed pursuant to Parts II and III of Chapter 159, Florida Statutes, as amended (the "Act").   The Authority is authorized pursuant to the provisions of the Act to issue revenue bonds for the purpose of financing and funding industrial development for profit and not-for-profit entities, including health care facilities.

### B.    The 2006 Revenue Bonds

The 1999 Bonds were redeemed with proceeds from the issuance of (a) $55,555,000 of Series 2006A Fixed Rate Health Care Revenue Bonds and (b) $4,000,000 of Series 2006B Adjustable Rate Health Care Revenue Bonds (collectively "the 20006 Bonds").   The 2006 Bonds were issued by the Authority as "additional bonds" under the Indenture, and the proceeds lent to the Debtor by the Authority pursuant to the Amended and Restated Loan Agreement, Mortgage, and Security Agreement dated September 15, 2006, as amended by the First Amendment dated August 1, 2009 (the "Loan Agreement").   In addition to refunding $48,355,000 of

outstanding 1999 Bonds, the proceeds of the 2006 Bonds were used to: (i) finance a portion of the cost of constructing and equipping 15 two-bedroom cottages; (ii) finance the costs of expanding and equipping Glenmoor's dining room; (iii) fund interest on a portion of the 2006 Bonds; (iv) fund the Debt Service Reserve Fund for the 2006 Bonds; and (v) pay certain costs incurred in connection with the issuance of the 2006 Bonds.

The 2006 Bonds are secured by substantially all of the Debtor's real and personal property, with the exception of the Debtor's Operating Reserve, which is held in an unencumbered account for the benefit of residents in accordance with Chapter 651. Additionally, the Renewal and Replacement Reserve is restricted and can be used only with OIR authorization.

| Series of Bonds | CUSIP | Maturity | Coupon | Amount Outstanding | Amt. Held by Institutions | % Held by Institutions |
|---|---|---|---|---|---|---|
| Series 2006A | 79039NAQ1 | 2016 | 5.000% | $2,870,000 | $2,080,000 | 72.47% |
| Series 2006A | 79039NAR9 | 2026 | 5.250% | $13,405,000 | $10,300,000 | 76.84% |
| Series 2006A | 79039NAS7 | 2040 | 5.375% | $35,340,000 | $34,975,000 | 98.97% |
| Series 2006B | 79039NAT5 | 2041 | 7.875% | $4,000,000 | $1,000,000 | 25.00% |
| **Totals** | | | | **$55,615,000** | **$48,355,000** | **86.95%** |

The requirements of Loan Agreement and other relevant documents governing the 2006 Bonds require the Debtor to comply with the following covenants:

- A Debt Service Coverage Ratio of at least 1.15x during each Fiscal Year (the "DSCR Covenant");

- Unrestricted cash and investments at least equal to 150 Days' Cash on Hand through December 31, 2008, and 180 Days' Cash on Hand thereafter (the "DCOH Covenant");

- Maintain at least 90 percent of its trade accounts payable at less than 60 days from the date such accounts are due and the remainder at less than 90 days from the date such accounts are due (the "Payables Covenant"); and

- Maintain at least 90 percent occupancy of the residential units at Glenmoor (the "Occupancy Covenant") (collectively the "Bond Covenants").

Glenmoor was not in compliance with the Occupancy and DSCR covenants for quarters ending December 31, 2010, December 31, 2011, March 31, 2012, June 30, 2012, September 30, 2012, and December 31, 2012.   Glenmoor was not in compliance with the DCOH covenant for quarters ending September 30, 2012 and December 31, 2012.

In addition and in compliance with Chapter 651, Florida Statutes, the Debtor maintains the Debt Service Reserve, the Operating Reserve and the Renewal and Replacement Reserve.   As of May 31, 2013, the Debtor's Debt Service Reserve was approximately $3,866,000, the Operating Reserve was approximately $1,714,000, and the Renewal and Replacement Reserve was approximately $1,719,000.   The reserves are held in segregated escrow accounts maintained with Wells Fargo, N.A.   The Operating Reserve is maintained in an unencumbered account and held in escrow for the benefit of the residents.

## V.      Affiliate Transactions

Vicar's Landing has advanced $8,800,000 to Glenmoor.   Interest was accruing at the "Wall Street" prime rate until March 26, 2012, at which time the accrued interest balance was written off and interest stopped accruing.   In addition, Vicar's Landing has supported LCPS Management by contributing $300,000 per year (total $3,600,000) to subsidize the management fees paid by Glenmoor.

## VI.     Events Leading to the Chapter 11 Case

### A.      Effects of Economic Downturn

Glenmoor was designed to consist of 245 independent living units, plus the 30-bed Assisted Living Center and 30-bed Health Center.   The number of Residential Units has gradually increased from 133 units in March 2005, 144 Residential Units from April 2005 to 2008, and 159 Residential Units thereafter.   In June 2005 Glenmoor reached 90% occupancy and in November 2005 the occupancy rate was 95%.   Through 2006, the occupancy rate continued at 95% and Glenmoor had a DSCR of 1.20.   For the seven months, ending July 31, 2006, Residential and Health Center revenue was less than 1% below budget and total operating expenses were about 5% under budget resulting in earnings before interest, taxes, depreciation and amortization of $387,976 which was $253,460 better than budget.

By 2006, Glenmoor had achieved 99 percent occupancy in the then existing 144 independent living units.   The Debtor then added 15 Berkshire cottages financed through the issuance of the 2006 Bonds.   Upon the completion of the Berkshire cottages in 2008 Glenmoor had a 94 percent occupancy rate, achieved by continuing to promote the growth of the World Gold Village and surrounding developments just as the housing market began its steep decline.

From the successful opening of the Berkshire through the second quarter of 2010, Glenmoor ran at a stable occupancy of 95 percent.   In 2010, occupancy dropped to 88% as a result of more move-outs (18) than move-ins (8).   That dichotomy triggered significant Entrance Fee refund obligations that have grown to a current unpaid amount of approximately $7,787,000 (the "Refund Queue").   Glenmoor has remained

-13-

approximately 88% occupied for 2011 and 2012, while experiencing lack of capacity in the Health Center, a depressed economic environment, and significant contraction in the development of World Golf Village and corresponding reduction in the pool of potential residents.

Additionally, the Debtor was negatively impacted by rising healthcare costs. Whereas 25% of residents currently residing in assisted living have stayed 43 months or longer; 25% of skilled nursing residents have stayed 52 months or longer.  Further, a disproportionate number of second persons have utilized healthcare services, which has contributed to the high cost of healthcare.   Also, the Debtor has been forced to outsource healthcare to competitor nursing facilities due to full occupancy on-site.   While the Debtor has tried to outsource Medicare recipients, there have been times when the Debtor has had to make payments to other nursing facilities for care provided to contracted residents.

Also, to remain competitive, the Debtor has been forced to adjust fees, including second person fees, to more appropriately match the market and ensure actuarial appropriateness.   When Glenmoor opened, a 90% refundable Type A contract was offered and many residents took advantage of that option.   Subsequent to that, the Debtor started selling a non-refundable and 75% refundable Type A contract and a non-refundable and 50% refundable Type C contract.   There has not been a balance in the contract utilization due to low pricing in the Type C option.

The economic climate and the housing market decline caused many depositors and other prospective residents to delay their move-in decision.   The interrupted move-in patterns did not keep pace with residents' attrition, thus giving rise to the Refund Queue. The related entrance fee cash flow from the re-occupancy of the vacant unit was spent on

current obligations in that period.   As those cash flow patterns were interrupted and refund obligations were triggered through death or move-out, the Refund Queue grew to the current amount of approximately $7,787,000.

### B.        Notice of Deficiency and Corrective Action Plans

In August 2012, the OIR issued a notice of deficiency with respect to the Refund Queue.   In response, the Debtor submitted a corrective action plan (the "CAP") on April 1, 2013.   By letter dated May 15, 2013, the OIR rejected the CAP because it failed to provide a complete resolution of the Refund Queue.

On April 17, 2013, the Debtor and the OIR entered into an Entrance Fee escrow agreement, pursuant to which all entrance fees are currently held in a restricted account. The OIR, the Financial Examiner/Analyst Supervisor of the CCRC Section, the Financial Administrator of the CCRC Section, and/or their designees, are the sole signatories and have sole authority to authorize withdrawals from the Entrance Fee escrow account. Release of Entrance Fees paid into such restricted account may be applied only as provided in the escrow agreement, which allows for the release of processing fees and earned amortized portion of the Entrance Fees upon written request of the Debtor and approval of the OIR.   The Entrance Fee escrow agreement provides only a limited resolution of the Refund Queue, and a comprehensive restructuring plan is necessary to ensure Glenmoor's long-term financial viability.

Recognizing that any viable plan for reduction of the Refund Queue required an agreement with bond holders, the Debtor began negotiating an agreement to restructure the 2006 Bonds.    To that end, the Debtor engaged Navigant Capital Advisors ("Navigant") as financial advisor, and employed the actuarial services of A.V. Powell.

Following lengthy negotiations, which included detailed and extensive analysis of Glenmoor's operations and finances, Glenmoor submitted an amended and revised CAP on June 27, 2013.

The amended and revised CAP had the support of the Bond Trustee along with certain institutional bond holders, and provided for, among other things, a two-year forbearance from debt service on the 2006 Bonds and two options for the repayment of the Entrance Fee refund claims: (i) an immediate 50% cash payment in full satisfaction of a claimant's refund claim, or (ii) deferred payments in full over a 12-year period.   On July 1, 2013, the OIR notified Glenmoor of the rejection of the amended and revised CAP.   The OIR has stated that it will initiate a receivership action to resolve the Refund Queue.

The repayment schedule of the 2006 Bonds is inexorably connected to the governing regulations, which are intended to calibrate debt service with resident protections; such as the refund obligations, Operating Reserve, and the Renewal and Replacement Reserve.   Repayment of refund obligations and debt service are both dependent on the receipt of Entrance Fees, which have proven to insufficient.   Thus, the fundamental impetus for the bankruptcy filing is the irreconcilable economics between the amount of Entrance Fees collected, and the required statutory and contractual escrow payments.

## VII.    Officers and Directors

| | |
|---|---|
| Fred Isaac<br>Chairman of the Board | Carl Bloesing, Jr. |
| James Hoener<br>Vice-chair of the Board | Rodney Brace |

Bruce Jones                                   Pamela Chally
Chief Executive Officer

Candy Bowling                                 William Murdock, III
Director of Financial Services                Treasurer of the Board

Dale Pirkle                                   Richard Kohler
Chief Operating Officer

Jeffery Watson
Secretary of the Board


## VIII.   Financial Summaries

For the years 2010 through 2040, the Indenture and Loan Agreement establish a yearly payment on the bond debt of approximately $3,848,000.   As shown below, revenues from operations are generally sufficient to operate the property; but do not produce surplus revenues above statutory escrow requirements.

The following table reflects the prior four years of operations:

|  | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Avg Occupancy | 92.7% | 90.4% | 87.5% | 88.7% |
| Revenue | $10,515,489 | $10,505,495 | $10,561,455 | $10,496,431 |
| Op exp. (excl. interest) | $9,341,559 | $9,452,243 | $9,729,254 | $9,323,375 |
| EBIDA | $1,173,930 | $1,053,252 | $832,201 | $1,173,056 |
| PP&E exp. | 320,257 | 413,094 | 1,993,439 | 1,242,293 |
| **Surplus Funds Available from Operations** | **$853,673** | **$640,158** | **($1,161,238)** | **($69,237)** |

IX.     **Amounts Owed to Various Classes of Creditors**[2]

The approximate amounts owed to various creditors are summarized below.

A.     **Secured Claims**

The Debtor's primary secured debt is owed to the Authority under the Loan Agreement and in connection with the issuance of the 2006 Bonds.  As of March 25, 2013, the outstanding bond obligations were as follows:

| Series of Bonds | CUSIP | Maturity | Coupon | Amount Outstanding | Amt. Held by Institutions | % Held by Institutions |
|---|---|---|---|---|---|---|
| Series 2006A | 79039NAQ1 | 2016 | 5.000% | $2,870,000 | $2,080,000 | 72.47% |
| Series 2006A | 79039NAR9 | 2026 | 5.250% | $13,405,000 | $10,300,000 | 76.84% |
| Series 2006A | 79039NAS7 | 2040 | 5.375% | $35,340,000 | $34,975,000 | 98.97% |
| Series 2006B | 79039NAT5 | 2041 | 7.875% | $4,000,000 | $1,000,000 | 25.00% |
| **Totals** | | | | **$55,615,000** | **$48,355,000** | **86.95%** |

Debt service on the 2006 Bonds has traditionally come from Entrance Fees, but Entrance Fees have proven insufficient to fund both debt service and repayment of the refund obligations.  Resolving this issue within the regulatory structure imposed under Chapter 651 is the most significant issue in this case.   With the OIR marshaling Entrance Fees for the benefit of refund participants pursuant to the April 2013 Entrance Fee escrow agreement, the Debtor has little or no available funds to pay debt service on the bonds. Yet, the OIR has stated that the Debtor's failure to formulate a repayment plan that will

---

[2]   Nothing contained herein is intended or should be construed as an admission as to the validity of any claims against the Debtor, and the Debtor reserves the right to contest any debt or claim listed.

service the bond debt and repay the refund obligations will result in the OIR seeking the appointment of a receiver.

### B.  Priority Claims

| | |
|---|---:|
| Accrued Payroll | $70,865 |
| Accrued Time Off | $170,683 |
| Payroll Tax | $8,801 |
| 403B Liability | $13,123 |
| Flex Spending Account | $(86) |
| Sales Tax Payable | $847 |

### C.  Unsecured Claims

| | |
|---|---:|
| Trade Payables | $252,268 |
| Accrued Expenses | $29,701 |
| Accrued Audit | $15,000 |
| Scholarship Fund | $3,648 |
| Employee Emergency Fund | $17,319 |
| Entrance Fee Refunds | $7,787,000 |

Total refund obligations coming due in the next 10-12 years are approximately $47,000,000.  As noted above, the Debtor is currently required to deposit all Entrance Fees into the restricted escrow account established by the OIR.   The escrowed Entrance Fees are held in trust solely for the benefit of residents entitled to refunds, and the entirety of the escrowed Entrance Fees may only be used to pay refund obligations. Thus, the non-refundable amortized portion of the escrowed Entrance Fees and the 4% processing fees that historically have been used by the Debtor for debt service on the 2006 Bonds must currently be used to pay outstanding refund obligations and reduce the Refund Queue.

Resolving the imbalance of available revenue to fund debt service and repay the current $7,500,000 in refund obligations, all within the regulatory framework imposed under Chapter 651, is the Gordian knot facing the Debtor.

**X.      Employee Matters**

The Debtor has 217 employees and owes approximately $150,000 in current wages as of the petition date:   The Debtor is current with respect to payroll tax and trust fund obligations.   The Debtor offers a Section 403(b) benefit plan through LCPS. Participation is open to any employee who works 20 hours a week.   Employees may enroll at any time and contribute up to 100% of wages or salary, with a 2013 maximum salary deferral of $17,500.   The plan also allows for ROTH contributions on a post-tax basis, with the Debtor making matching contributions of up to 4% beginning after 6 full months of employment.   The Debtor has approximately 42 employees contributing to the benefit plan.

**XI.     Anticipated Emergency Relief Needed in First 14 Days**

The Debtor anticipates filing the following motions in the first week of this Chapter 11 case:

(i)      Motion for Authority to Utilize Cash Collateral;

(ii)     Motion to Pay Prepetition Wages;

(iii)    Motion to Limit and Establish Notice Procedures;

(iv)    Motion for an Order (A) Authorizing Continued Use of Cash Management System and Maintenance of Escrow Accounts, and (B) Directing Depository Institutions to Honor the Debtor's Postpetition and Prepetition Checks, Drafts, Wires, or Other Transfers;

(v)     Application for an Order Retaining Stutsman Thames & Markey, P.A. as Debtor's Counsel;

(vi)    Application for an Order Retaining Navigent Capital Advisors, LLC as Debtor's Financial Advisor; and

(vii)    Motion to Pay Utilities.

Each of the forgoing items will need to be addressed on an expedited basis.

**STUTSMAN THAMES & MARKEY, P.A**

*/s/ Eric N. McKay*

By_____
  Richard R. Thames
  Eric N. McKay

Florida Bar Number 0718459
Florida Bar Number 0010215
50 North Laura Street, Suite 1600
Jacksonville, Florida   32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@stmlaw.net
enm@stmlaw.net

Proposed attorneys for Life Care St. Johns, Inc.,
doing business as Glenmoor

## Certificate of Service

I certify that, on July 3, 2013, a copy of the foregoing was filed electronically with the Court's CM/ECF filing system which will generate an electronic notice of filing to the Office of the United States Trustee, 135 W. Central Blvd., Room 620, Orlando, Florida 32280, and sent by U.S. mail to all creditors and parties in interest.


*/s/ Eric N. McKay*
_____
Attorney

12.6